UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VANCE WARKATA BROWN,<br><br>Defendant. | 4:21-CR-40066-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Vance Warkata Brown is before the court on an indictment charging him with possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(2), and 922(g)(9).  See Docket No. 1. Mr. Brown has filed a motion to suppress certain evidence.  See Docket No. 35. The United States ("government") resists the motion.  See Docket No. 39.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

**FACTS**

An evidentiary hearing was held on November 8, 2021, in Sioux Falls, South Dakota.  Mr. Brown was there in person along with his lawyer,

Amanda D. Kippley, Assistant Federal Public Defender.  The government was represented by its Assistant United States Attorney, Tamara P. Nash.  Two witnesses testified and two exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On November 24, 2020, at approximately 1:54 a.m., Officer Kyler Pekarek[1] of the Yankton Police Department was patrolling East Highway 50 near Ferdig Street in Yankton, South Dakota.  While following a maroon 2004 Chevrolet K1500, Officer Pekarek observed the driver turn east onto Highway 50, avoiding the inside lane, and enter the outside lane.  (01:01, Exhibit 1A)[2].  Officer Pekarek initiated a traffic stop based on a violation of SDCL § 32-26-18[3].

Upon making the stop, Officer Pekarek approached the vehicle's passenger-side window.  (00:46, Exhibit 1B).  Officer Pekarek told the driver

---

[1] Officer Pekarek was a police officer with the Yankton Police Department for five years and was also a certified canine handler.  Since then, Officer Pekarek has resigned from the police force for personal reasons.

[2] The time stamps of this interaction vary between the different cameras.  The times cited will be based on the minutes and seconds in the video, not based on the time of day.  Exhibit 1A is Officer Pekarek's vehicle cameras and Exhibit 1B is Officer Pekarek's body camera.

[3] South Dakota Codified Law § 32-26-18 provides:

> The driver of a vehicle intending to turn left shall approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of the vehicle.  If practicable, the left turn shall be made to the left of the center of the intersection and so as to leave the intersection or other location in the extreme left-hand lane lawfully available to traffic moving in the same direction as the vehicle on the roadway being entered.  A violation of this section is a Class 2 misdemeanor.

2

and passenger of the vehicle the reason for the stop was a "turn violation." (00:54, Exhibit 1B). Officer Pekarek informed the occupants that he was not going to write them a ticket for the lane violation. (01:23, Exhibit 1B). Officer Pekarek confirmed that the driver had an ID and identified the driver as the defendant, Mr. Vance Brown. (01:44, Exhibit 1B). Officer Pekarek requested that Mr. Brown follow him to his patrol vehicle. Id. The passenger identified herself as Sara Stokes and indicated that she did not have identification on her person. (01:52, Exhibit 1B).

While approaching the patrol vehicle, Mr. Brown expressed fear of getting into Officer Pekarek's car with the dog in the back seat, stating "I will sit on the ground, I don't want to be by a dog." (02:15, Exhibit 1B). Nonetheless, Mr. Brown got into the front passenger seat of the patrol vehicle. (02:21, Exhibit 1B). During this time, another law enforcement vehicle belonging to Officer Jericho Osborne[4] was parked behind Officer Pekarek's car. Both Officer Pekarek and Officer Osborne testified that it was routine practice of the Yankton Police Department for there to be two police cars during a traffic stop at this time of night due to officer safety concerns. Officer Osborne testified that his primary role was to keep an eye on the suspect's vehicle and to provide back-up for Officer Pekarek if needed. Officer Pekarek testified that he never requested assistance and there was no previous coordination with any officer regarding Mr. Brown's traffic stop.

---

[4] Officer Osborne has been a patrolman with the Yankton Police Department for three years.

While inside the patrol vehicle, Officer Pekarek described his reason for the stop to Mr. Brown.  (02:44, Exhibit 1B).  As Officer Pekarek conducted a NCIC[5] query search into Mr. Brown's identification, he simultaneously asked where Mr. Brown was coming from that evening, what brought Mr. Brown into town, and where Mr. Brown was from originally.  (03:15, Exhibit 1B). Mr. Brown stated they were coming from the Cockatoo Gentlemen's Club, which is also where Ms. Stokes worked.  (03:20, Exhibit 1B).  Officer Pekarek testified that the Cockatoo Gentlemen's Club is known for the sale and use of illegal drugs in Yankton, South Dakota.  Furthermore, Officer Pekarek testified that during this initial conversation, he observed Mr. Brown's carotid artery beating out of his neck, he was breathing heavily, his chest was raised, his body was rigid, he was staring straight ahead, and he was showing other signs of nervous behavior.

Mr. Brown then asked Officer Pekarek for directions to the "Lodge Motel." (03:23, Exhibit 1B).  Officer Pekarek questioned if he meant the "Econo Lodge," Mr. Brown said yes, and Officer Pekarek indicated that it was "all the way back on Broadway." (03:30, Exhibit 1B).

While the conversation continued, Officer Pekarek began to write a warning for the lane violation.  (03:33, Exhibit 1B).  As Officer Pekarek worked on the warning, he learned that Mr. Brown's driver's license was revoked. (07:05, Exhibit 1B).  Mr. Brown asked what a revoked license meant, and

---

[5] National Crime Information Center.  This is a national database for tracking crime-related information.

Officer Pekarek said, "I am just going to write you a ticket, that's it . . . Normally, you go to jail."[6]  (07:23, Exhibit 1B).  Officer Pekarek asked Mr. Brown what he was revoked for, and Mr. Brown indicated he was unsure. (07:40, Exhibit 1B).  Officer Pekarek then handed Mr. Brown the lane violation warning, told him he could just throw it away, and began writing the citation for driving with a revoked license.  (07:54, Exhibit 1B).

As Officer Pekarek continued working on the citation, he advised Mr. Brown that he was a K9 unit and asked, "Is there anything up in the vehicle I need to know about?" (09:30, Exhibit 1B).  Mr. Brown responded in the negative.  Officer Pekarek then asked Mr. Brown if there were pills, heroin, cocaine, or methamphetamine in the vehicle.  (10:00, Exhibit 1B).  Again, Mr. Brown responded in the negative.  When asked about heroin, Mr. Brown began to laugh and can be seen scratching or rubbing his head.  (10:12, Exhibit 1B).  Officer Pekarek testified that, in his training and experience, this was a grooming gesture.  Officer Pekarek explained that a grooming gesture, such as forced laughter and scratching of the head that he observed Mr. Brown doing, is a way for people to calm their nerves in stressful situations. Additionally, Officer Pekarek testified that he continued to observe the nervous behavior—carotid beating quickly, raised chest, heavy breathing—that he had previously seen.  When being questioned on whether these physical indications

---

[6] Officer Pekarek testified that driving with a revoked license is a class 1 misdemeanor in South Dakota.  However, because the Yankton County Jail was not accepting misdemeanor arrests due to the COVID-19 pandemic, Officer Pekarek used his discretion to just issue a citation with a mandatory court date for this violation.

were normal signs of nervousness when being stopped by the police,

Officer Pekarek stated that, in his experience, a suspect's nerves tend to calm

down once they find out they are only getting a ticket and are not going to jail;

here, Officer Pekarek testified Mr. Brown's nerves continued to get increasingly

worse as the traffic stop progressed.

While continuing to work on the citation, Officer Pekarek requested

consent to search the vehicle. (10:33, Exhibit 1B). Mr. Brown denied consent.

Officer Pekarek then asked for consent to deploy his K9, Reno, around the

vehicle. (11:01, Exhibit 1B). Again, Mr. Brown denied consent.

Officer Pekarek then exited the patrol vehicle, walked to the passenger side of

Mr. Brown's car, and asked Ms. Stokes if there was any marijuana in the car.

(11:28, Exhibit 1B). Ms. Stokes admitted that they do smoke, but stated there

were just cigarettes in the car. (12:00, Exhibit 1B). Officer Pekarek instructed

Ms. Stokes to roll up her window while he deployed his K9 around the vehicle.

(12:20, Exhibit 1B).

When questioned as to why he chose to deploy his K9 after being denied

consent by Mr. Brown, Officer Pekarek testified that Mr. Brown's nervous

behavior; off-topic conversations; the fact they were coming from the Cockatoo

Gentlemen's Club, which was a place known for criminal activity; the fact the

car was registered to Mr. Brown's brother in Sioux Falls when Mr. Brown lived

four hours away in Rogers, Minnesota; and Mr. Brown's stated destination for

the evening was completely off route, gave Officer Pekarek suspicion of

criminal activity.

Shortly afterward, Officer Pekarek deployed his K9, Reno. (12:35, Exhibit 1B). Reno provided a positive indication for the odor of narcotics in Mr. Brown's vehicle. (12:50, Exhibit 1B). Once he returned to his patrol vehicle, Officer Pekarek informed Mr. Brown that the dog indicated to the odor of drugs and asked, again, "Is there anything I need to know about?" (13:20, Exhibit 1B). Officer Pekarek advised that he would be conducting a search of the vehicle. (13:22, Exhibit 1B). Mr. Brown admitted to smoking "pot roaches" in the vehicle earlier that day but denied anything else would be inside. (13:27, Exhibit 1B). Officer Pekarek then asked Mr. Brown if he had been on "paper" before (14:45, Exhibit 1B), to which Mr. Brown responded that he had been on probation for a 3rd offense driving under the influence. (15:28, Exhibit 1B).

Officer Pekarek informed Mr. Brown that the reason he asked him about drugs in the first place was because "your carotid was going, breathing heavy, your body is rigid, bringing up other conversations and topics, stuff like that." (15:34, Exhibit 1B). Mr. Brown began to laugh at this. (15:58, Exhibit 1B). As Officer Pekarek exited to begin his search, Reno began to bark in the back seat, which frightened Mr. Brown to the point he exited the vehicle. (16:42, Exhibit 1B). Mr. Brown commented that the dog was probably why he had the physical indicators Officer Pekarek cited. (16:54, Exhibit 1B). Officer Pekarek then walked over to Mr. Brown's vehicle and asked Ms. Stokes to step out while he conducted the search. (17:46, Exhibit 1B). Once Ms. Stokes stepped out, Officer Pekarek began his search of the vehicle. (18:35, Exhibit 1B). While

Officer Pekarek conducted the search, Mr. Brown and Ms. Stokes stood near Officer Osborne.

During the search, Officer Pekarek found a firearm located inside a blue backpack, serial number 4339963.  (27:35, Exhibit 1B).  Officer Pekarek testified that the gun was a black .45 caliber Hi-Point handgun.  While Officer Pekarek was wrapping up his search, Mr. Brown shouted to Officer Pekarek, "you all up in that motherf*cker, ain't you," describing how thoroughly Officer Pekarek was searching the vehicle.  (38:15, Exhibit 1B).

In response, Officer Pekarek stated to Mr. Brown, "I am trying to figure out whose gun this is."  (38:17, Exhibit 1B).  After this statement, Mr. Brown, replied, "mine . . . I am not a violent offender.  In the State of South Dakota, I can have it."  (38:25, Exhibit 1B).  Officer Pekarek asked Mr. Brown if he had any drug convictions, to which Mr. Brown responded in the negative.  (38:33, Exhibit 1B).  Mr. Brown stated that the reason he had the gun was because his sister,[7] Ms. Stokes, had been previously robbed at another strip club and he kept it for protection.  (38:50, Exhibit 1B).  Officer Osborne also testified that Mr. Brown admitted possession of the firearm to him, and that Mr. Brown got the gun "off the streets" in Sioux Falls, South Dakota, for protection.

Officer Pekarek then returned to his patrol vehicle to conduct additional checks into Mr. Brown's criminal history.  (41:00, Exhibit 1B).  Officer Pekarek

---

[7] Throughout the traffic stop, Mr. Brown and Ms. Stokes refer to each other as brother and sister.  As the encounter progresses, Mr. Brown admits that they are not related by blood and ultimately admits to having an affair with Ms. Stokes.

asked Ms. Stokes to accompany him to his vehicle to discuss issues confirming her identity. (52:00, Exhibit 1B). While in the vehicle, Officer Pekarek asked Ms. Stokes if Mr. Brown had been to prison to determine if he could lawfully possess the weapon. (54:49, Exhibit 1B). Ms. Stokes replied, "not that I know of," and indicated that she was unaware of the firearm in the vehicle. (55:11, Exhibit 1B). Officer Pekarek informed Ms. Stokes that he was not going to cite her for having a "weed pipe." (59:14. Exhibit 1B).

After this conversation, Officer Pekarek resumed filling out Mr. Brown's citation for driving with a revoked license and requested a court date. (01:00:22, Exhibit 1B). Officer Pekarek informed Mr. Brown that he would be taking the firearm with him to continue his investigation. (01:02:20, Exhibit 1B). Officer Pekarek issued Mr. Brown the citation, explained the citation, and released him from the scene. (01:04:10, Exhibit 1B).

Both Officer Pekarek and Officer Osborne testified that they did not provide Miranda[8] warnings to Mr. Brown or Ms. Stokes. Neither officer placed Mr. Brown or Ms. Stokes in handcuffs, never made a formal arrest, and never intended to arrest them. Furthermore, the only physical contact Officer Pekarek testified he had with Mr. Brown was a search of Mr. Brown's person after the dog alerted to the odor of drugs in the vehicle.

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

## DISCUSSION

**A.    Whether Officer Pekarek Unreasonably Prolonged the Traffic Stop in Violation of the Fourth Amendment**

Mr. Brown alleges the duration of the traffic stop violated his Fourth Amendment rights.  The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (quoting United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979))).

A traffic stop may be lawfully made under two circumstances.  If there is probable cause to stop the vehicle, such a stop is lawful.  United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Coney, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002))).  Also, if there is reasonable suspicion to stop the vehicle, the stop complies with the Fourth Amendment.  Navarette v. California, 572 U.S. 393, 397 (2014); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).

Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed a crime.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  There need only be "a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity."  United States v. Torres-Lona, 491 F.3d 750,

755-56 (8th Cir. 2007) (quotation omitted).  There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed.  Wong Sun v. United States, 371 U.S. 471, 479 (1963) (quotation omitted).

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest.  Berkemer v. McCarty, 468 U.S. 420, 439 . . . (1984).  As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 . . . (1968)."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry v. Ohio, 392 U.S. 1, 20 (1968).  Thus, a traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]"  United States v. Jacobsen, 466 U.S. 109, 124 (1984).  Mr. Brown does not dispute that the initial traffic stop was justified.  Therefore, the only question before the court is whether the stop was unjustifiably prolonged beyond the limitations of the Fourth Amendment.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407

(2005)], and attend to related safety concerns[.]" Rodriguez v. United States,
575 U.S. 348, 354 (2015). See also Florida v. Royer, 460 U.S. 491, 500 (1983)
(plurality opinion) ("The scope of the detention must be carefully tailored to its
underlying justification."). "[A]n investigative detention must be temporary and
last no longer than is necessary to effectuate the purpose of the stop.
Similarly, the investigative methods employed should be the least intrusive
means reasonably available to verify or dispel the officer's suspicion in a short
period of time." Royer, 460 U.S. at 500. "A seizure that is justified solely by
the interest in issuing a warning ticket to the driver can become unlawful if it
is prolonged beyond the time reasonably required to complete that mission."
Caballes, 543 U.S. at 407. "Authority for the seizure thus ends when tasks
tied to the traffic infraction are—or reasonably should have been—completed."
Rodriguez, 575 U.S. at 354.

"After a law enforcement officer initiates a traffic stop, the officer may
detain the offending motorist while the officer completes a number of routine,
but somewhat time-consuming tasks related to the traffic violation." United
States v. Englehart, 811 F.3d 1034, 1040 (8th Cir. 2016) (quotation omitted).
"Beyond determining whether to issue a traffic ticket, an officer's mission
[during a traffic stop typically] includes . . . checking the driver's license,
determining whether there are outstanding warrants against the driver, and
inspecting the automobile's registration and proof of insurance." Rodriguez,
575 U.S. at 355 (quotation and citation omitted). See also United States v.
Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to

a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)).  "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.' " United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

To extend a routine traffic stop, an officer needs reasonable suspicion of additional criminal activity.  Rodriguez, 575 U.S. at 355.  Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop. Terry, 392 U.S. at 21.  This standard is "less demanding" than probable cause and much lower than preponderance of the evidence.  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

To determine whether the requisite degree of suspicion exists, courts must decide whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion, meaning the totality of the circumstances must be considered.  Jones, 269 F.3d at 927.  The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.' "  Id. (quoting Reid v. Georgia, 448 U.S. 428, 441 (1980)).

13

Absent further reasonable suspicion, an officer may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission. Rodriguez, 575 U.S. at 354-55. Yet, an officer may lawfully engage in unrelated inquiries so long as they do not measurably extend the duration of the stop. Id. at 355. The Supreme Court in Rodriguez found that a dog sniff is not an ordinary inquiry incident to a traffic stop and, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' " Id. (quoting Indianapolis v. Edmond, 531 U.S. 32, 40-41 (2000)). "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." Rodriguez, 575 U.S. at 356.

The Eighth Circuit has held in the past that each of the following factors, in combination with others, can help support reasonable suspicion: (1) unusual driving behavior, see United States v. Walker, 555 F.3d 716, 720 (8th Cir. 2009); (2) attempts to evade officers, see United States v. Noonan, 745 F.3d 934, 936 (8th Cir. 2014); (3) indirect or incomplete answers to officer questions, see United States v. Murillo-Salgado, 854 F.3d 407, 416 (8th Cir. 2017); (4) nervousness and lack of eye contact, see United States v. Foley, 206 F.3d 802, 804, 806 (8th Cir. 2000); and (5) "seeming implausibilities and inconsistencies in the responses to [an officer's] routine questions" about travel plans. See Murillo-Salgado, 854 F.3d at 416.

### 1. The "Mission" of Officer Pekarek's Traffic Stop

Again, because a traffic stop is subject to Fourth Amendment protections against unreasonable searches and seizures, a traffic stop must be supported

14

by either reasonable suspicion or probable cause to believe the driver has violated a traffic law or committed a traffic violation.  <u>Soderman</u>, 983 F.3d at 374.

Here, Officer Pekarek's original mission was to stop Mr. Brown for a lane change infraction, in violation of SDCL § 32-26-18.  Upon discovering that Mr. Brown was driving with a revoked license, Officer Pekarek's mission expanded to include dealing with this new infraction.  Therefore, following <u>Rodriguez</u>, the court must determine whether the tasks tied to writing citations for the traffic violation and driving with a revoked license reasonably could have been completed expeditiously and, if so, whether the traffic stop exceeded the amount of time reasonably required to complete them.  If the drug interdiction questions and dog sniff added time to the stop, the stop violated the Fourth Amendment unless the extension was supported by reasonable suspicion of further criminal activity.  <u>Rodriguez</u>, 575 U.S. at 354.

### 2.    Whether the "Mission" of the Traffic Stop Had—or Should Have—Been Completed

The government argues that the tasks related to the traffic stop had not been completed; that the canine sniff occurred before the time the tasks associated to the mission of the stop were—or reasonably should have been—completed.  Docket No. 39, p. 7.  The government cites <u>Soderman</u> in support. Docket No. 39, pp. 7-8.

In <u>Soderman</u>, an Iowa State Trooper pulled Mr. Soderman over for driving seventeen miles per hour above the speed limit.  <u>Soderman</u>, 983 F.3d at 372.  Mr. Soderman appeared unkempt, had an unpleasant body odor, and

15

was nervously tapping his steering wheel.  Id.  The trooper observed two large duffel bags, aftermarket wires, snacks, and energy drinks within the vehicle's passenger compartment.  Id.  The trooper then asked Mr. Soderman to exit his vehicle and sit in the front seat of the patrol car, which Mr. Soderman did.  Id.  Mr. Soderman told the trooper that he was traveling from Colorado to Minnesota to visit his father and dying stepmother.  Id.

While completing a records check, the trooper discovered that Mr. Soderman's driver's license had been suspended for unpaid child support.  Id. at 373.  Mr. Soderman disputed the suspension and became more agitated, repeatedly stating that he had made the required support payments.  Id.  Believing that he had observed indicia of drug trafficking, the trooper called another police officer, Officer Merchant, who was more experienced in drug interdiction.  Id.

Because he could not lawfully continue to drive with a suspended license, Mr. Soderman called a tow truck company.  Id.  Officer Merchant arrived before the arrival of the Soderman-summoned tow truck.  Id.  Like the trooper, Officer Merchant also observed Mr. Soderman's behavior and viewed the contents of his vehicle's passenger compartment.  Id.  Because Mr. Soderman was confused about his exact location, he handed his phone to Officer Merchant so she could provide his father with directions.  Id.  During her conversation with him, Officer Merchant asked Mr. Soderman's father if Mr. Soderman had been involved in drug trafficking, to which the father responded either, "not for a long time," or, "well not recently."  Id.  Further,

16

Mr. Soderman's father said that he did not know that Mr. Soderman was on his way to Minnesota.  Id.

Based on her observations and law enforcement experience, Officer Merchant concluded that she had probable cause to believe that there would be evidence of drug paraphernalia within the car.  Id.  She decided to seize the vehicle and requested a second tow truck.  Id.  Officer Merchant submitted to a state judge the application and the affidavit needed to obtain a search warrant, but mistakenly failed to submit the required warrant itself.  Id.  Believing that she had obtained a valid warrant, Merchant searched Soderman's vehicle, discovering methamphetamine, marijuana, a loaded firearm, magazines and ammunition, and a digital scale in the trunk.  Id.

Arguing that the warrant was invalid, Mr. Soderman moved to suppress the evidence obtained from his vehicle, as well as the statements he made during the traffic stop.  Id.  The district court denied the motion.  Id.  On appeal to the Eighth Circuit, Mr. Soderman argued that the trooper unlawfully extended the traffic stop in violation of Rodriguez.  Id. at 374.  Affirming the district court, the Eighth Circuit held that the trooper's discovery that Mr. Soderman's driver's license had been suspended justifiably extended the lawful scope of the traffic stop due to Mr. Soderman's legal inability to remove the vehicle from the scene.  Id. (citing United States v. Ovando-Garzo, 752 F.3d 1161, 1164 (8th Cir. 2014) (concluding that when none of the occupants of a vehicle were licensed to drive, the officer was permitted "to engage in a community caretaking function of safely moving the vehicle and its occupants

17

from the side of the road")).  Furthermore, the court held that "[t]he confluence of Soderman's decision to call a tow truck, Merchant's arrival, and . . . her development of probable cause to seize the vehicle vitiates any claim that the stop was unlawfully prolonged." Id.

Here, the government argues that Soderman is instructive because Officer Pekarek's actions, up to the deployment of the K9, were tied to the mission of the traffic stop—the lane violation.  Docket No. 39, p. 8.  Prior to the warning being completed, Officer Pekarek learned of a new violation, driving with a revoked license, which he then began to act on.  Id.  Thus, because "complications [arose] in carrying out the traffic-related purposes of the stop," Officer Pekarek was justified in expanding the scope and time required for the traffic stop.  Soderman, 983 F.3d at 374 (quotation omitted).

Mr. Brown argues that Soderman is similar to his case in just one aspect—after investigation into the initial purpose of the stop the law enforcement officer discovered that the driver's license was revoked.  Docket No. 36, p. 10-11.  Beyond that, Mr. Brown argues that his case is distinguishable from Soderman because, in that case, the dog sniffs occurred while the defendant was awaiting a tow truck, and, in Mr. Brown's case, no one considered calling a tow truck or arranging for another driver at the conclusion of the stop.  Id.  Here, at the conclusion of the traffic stop, the law enforcement officers allowed Mr. Brown and his passenger to drive away even though Mr. Brown's license was revoked and the passenger did not have a license.  Id. The court agrees.

While it is true that both Mr. Brown and Mr. Soderman were discovered to have revoked or suspended licenses, Soderman is distinguishable from Mr. Brown's case because there was no community caretaker issue in Mr. Brown's case. There was no discussion between either Officer Pekarek or Officer Osborne of arresting Mr. Brown or calling a tow truck or arranging for another driver to come to the scene. As stated above, the Eighth Circuit in Soderman held the fact that Mr. Soderman's driver's license had been suspended justifiably extended the lawful scope of the traffic stop because Mr. Soderman's legal inability to remove the vehicle from the scene created a safety issue the police needed to resolve by removing the vehicle. Soderman, 983 F.3d at 374. Here, Officer Pekarek allowed Mr. Brown to freely drive away from the scene despite his revoked license, and there was no community caretaker issue to justify prolonging the stop.

Accordingly, the court returns to the question of whether Officer Pekarek's mission of addressing the traffic violation, investigating Mr. Brown's revoked license, and writing him citations had been completed, or reasonably should have been. Rodriguez, 575 U.S. at 354. Officer Pekarek testified that, depending on how readily available a suspect's information was, it typically took him five to ten minutes to write a citation. Looking to the body camera footage in Exhibit 1B, Officer Pekarek started writing the citation for driving with the revoked license at 07:54. Officer Pekarek did not complete that citation until 1:04:10, nearly an hour after discovering Mr. Brown had been driving with a revoked license. Therefore, based on Officer Pekarek's own

19

testimony, it is clear that a reasonable police officer would, and should, have completed the tasks tied to investigating and writing a citation to Mr. Brown for driving with a revoked license much sooner than he did.

Due to this finding, the court must now determine whether Officer Pekarek developed sufficient reasonable suspicion to prolong the detention. Absent reasonable suspicion of further criminal activity, Officer Pekarek's search would be in violation Mr. Brown's Fourth Amendment rights under Rodriguez.

### 3. Whether Officer Pekarek Developed Sufficient Reasonable Suspicion to Prolong the Detention

The government argues Officer Pekarek had sufficient reasonable suspicion to lawfully prolong the traffic stop under the Fourth Amendment. See Docket No. 39. Again, if an officer develops reasonable suspicion of the existence of other criminal activity during a traffic stop, then the officer may expand the scope of the encounter to address that suspicion. United States v. Peralez, 526 F.3d 1115, 1120 (8th Cir. 2008). An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered. Linkous, 285 F.3d at 720.

Here, the government generally argues that "in this case Pekarek had reasonable suspicion for the detention beyond the initial traffic stop" without citing any additional facts or law to support their contention. Docket No. 39, p. 9. Mr. Brown disputes this, arguing that Officer Pekarek did not have reasonable suspicion to extend the traffic stop. Docket No. 36, p. 7.

20

### a.    The Applicability of <u>United States v. Peralez</u> and <u>United States v. Barrera</u>

Mr. Brown cites to <u>United States v. Peralez</u> and <u>United States v. Barrera</u> in support of the argument that Officer Pekarek had no lawful basis to prolong the traffic stop.  <u>See</u> Docket No. 36, p. 7, 9, 10, 11.

In <u>Barrera</u>, a sheriff stopped a vehicle with Washington license plates for crossing fog lines on the road.  <u>United States v. Barrera,</u> No. 20-CR-10010, 2020 WL 6268395 (D.S.D. Oct. 10, 2020).  As he approached the vehicle, the sheriff observed that the driver's movements appeared to be jumpy and hurried and that the driver appeared to be attempting to hide something between the seats or in the center console.  <u>Id.</u> at *2.  The sheriff also noticed an overwhelming smell of air freshener; that the rear window was partially rolled down, even though it was 36 degrees outside with winds gusting up to 19 mph; and that the driver was not wearing any type of winter clothing.  <u>Id.</u>

The sheriff informed the driver about the reason for the stop, that he would issue the driver a warning ticket, and requested the driver accompany him to the patrol car to complete the stop.  <u>Id.</u>  Thereafter, two minutes after initiating the traffic stop, the sheriff requested a K9 unit come to their location. <u>Id.</u>  The sheriff then informed the driver that, in addition to conducting traffic stops, he "was also running saturation patrol looking for any other criminal activity."  <u>Id.</u>  The court stated that it was at this point that it was "clear [the sheriff] had already determined that he was going to detain [the driver] long enough to run a dog sniff, even if [the driver] had to be detained beyond the time it took to write the warning ticket."  <u>Id.</u>

While writing the warning ticket, the sheriff engaged the driver in conversation and learned about the driver's travel plans.  Id.  He also asked the driver about whether there were any drugs in the vehicle, which the driver denied, and about the ownership of the vehicle, to which the driver responded the vehicle belonged to his brother.  Id. at *2-3.  The sheriff then asked the driver what the driver would say if the sheriff asked for consent to search the vehicle, to which the driver responded, "yeah that's fine."  Id. at *3.  The sheriff contacted the canine deputy and informed him that the driver had consented to the search.  Id.  Approximately one minute later, the driver revoked his consent.  Id.  About 90 seconds after that, the sheriff completed the warning ticket, and proceeded to ask the driver questions on subjects unrelated to the stop.  Id.  After the driver said he was in a bit of a hurry, the officer said they were going to wait for the drug dog.  Id.  The driver then said he did not want the trunk of his car searched.  Id.  The K9 unit arrived approximately eight minutes later, and a canine sniff was conducted around the entire vehicle.  Id.  The dog alerted to the vehicle, a search was conducted, and the driver was arrested.  Id.

The driver thereafter filed a motion to suppress the evidence seized during the search, asserting that the sheriff unlawfully prolonged the stop beyond the time necessary to complete the warning ticket.  This court agreed.  In so agreeing, this court stated "[t]he stop was not expanded for any purpose related to the fog line violation.  Rather, the stop was expanded because the officers were out looking for any other criminal activity.  Such delay is not

allowed." Id. at *4.  Accordingly, this court concluded that, because the mission to write a warning ticket could have been completed in minutes and the driver was delayed to allow for the dog sniff, the motion to suppress should be granted. Id. at 4-5.

Likewise, in Peralez, the Eighth Circuit held that when an officer intermixes drug interdiction actions with routine traffic questions, it unconstitutionally prolongs a traffic stop. Peralez, 526 F.3d at 1120.  In Peralez, a K9 trooper with the South Dakota Highway Patrol initiated a traffic stop on a vehicle for having obstructed license plates. Id. at 1117.  The driver of the vehicle accompanied the trooper back to his patrol car where the two discussed licensing requirements.  The trooper informed the driver that he would receive a warning ticket for the license offense and then conducted "routine tasks" associated with a traffic stop. Id. at 1120.  As the trooper was completing the warning ticket, he began asking the driver general questions about where he was traveling, his family, and his vehicle. Id. at 1117.

The trooper then shifted to drug interdiction topics and proceeded to ask the driver if there were any drugs or large amounts of cash in the vehicle, if the driver had used drugs recently, and if there would be any reason why his dog would indicate to the odor of drugs in the vehicle. Id. at 1117-18.  The driver said there were no drugs in the vehicle, denied personally using drugs, said he knew of no reason that would cause the dog to indicate if sniffing the vehicle, but stated there was approximately $2,800 in cash in the vehicle belonging to the vehicle's passenger. Id. at 1118.  The trooper then made contact with the

passenger, gathered information from the passenger, and called in both men's identifications.  Id.  Dispatch responded regarding the driver's information after one minute, but before responding regarding the passenger's information, the trooper conducted a canine sniff around the vehicle.  Id.  The dog indicated near the driver's side door.  Id.  A search of the vehicle ensued, and illegal contraband was discovered.  Id.

The driver filed a motion to suppress.  The magistrate judge recommended the motion be granted, the district court adopted the magistrate judge's recommendation, and the Eighth Circuit agreed that the detention was unconstitutionally prolonged.  Id. at 1119.  On appeal, the Eighth Circuit rejected the government's argument that the trooper did not unreasonably prolong the stop because he had engaged in "a 'blended process,' interspersing drug interdiction questions with the routine processing of a traffic stop."  Id. at 1120.  The court concluded that, even though the officer needed to complete the warning citation, "[o]nce an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to any subsequent search or detention."  Id. (quoting United States v. Alexander, 448 F.3d 1014, 1016 (8th Cir. 2006)).  Because the trooper's "non-routine questions prolonged the stop 'beyond the time reasonably required' to complete its purpose," the court held the trooper violated the driver's Fourth Amendment rights.  Id. at 1121.

Mr. Brown argues these cases are instructive because "once an officer has decided to permit a routine traffic offender to depart with a ticket, a

24

warning, or an all clear, the Fourth Amendment applies to any subsequent search or detention." Peralez, 536 F.3d at 1120.  Mr. Brown argues that because Officer Pekarek abandoned his mission to pursue non-routine questions that prolonged the stop beyond the time reasonably required to complete its purpose, Officer Pekarek violated Mr. Brown's Fourth Amendment rights.  The court disagrees.

Contrary to Mr. Brown's arguments, United States v. Peralez, is inapposite.  In Peralez, an officer found nothing unusual or out of place with the defendant's driver's license or vehicle registration; the stop was delayed entirely because of the officer's drug-interdiction questioning.  Id. at 1120.  Here, unlike in Peralez, the length of the stop was directly related to Officer Pekarek investigating Mr. Brown's revoked license, the nervous behavior Mr. Brown was exhibiting, and the fact they were coming from the Cockatoo Gentlemen's Club, which is an establishment known for drugs and criminal activity.

Furthermore, United States v. Barrera, is also misplaced.  In Barrera, the officer did not find anything suspicious about the defendant's driver's license.  Rather, the court found that the stop was expanded because the officers were looking for further criminal activity, and it was clear the sheriff had determined he was going to detain the driver at the outset of the stop even if the driver had to be detained beyond the time it took to write the warning ticket.  Barrera, 2020 WL 6268395, at *2, 4.  Here, Officer Pekarek's original mission was to deal with Mr. Brown's lane change violation, but that mission changed upon

25

discovery of Mr. Brown's revoked license.  While completing the tasks associated with writing the citation for driving with a revoked license, Officer Pekarek observed numerous behaviors and statements that gave rise to reasonable suspicion.  Unlike the officer in Barrera, there is no indication that Officer Pekarek made a decision at the inception of the traffic stop that he would search Mr. Brown's vehicle.

### b.    Officer Pekarek's Testimony

Given Officer Pekarek's testimony, the court concludes there was sufficient reasonable suspicion for Officer Pekarek to prolong the traffic stop.

In United States v. Riley, a Missouri State Highway Patrol trooper pulled over a vehicle driven by Mr. Riley after observing him twice cross the center line.  United States v. Riley, 684 F.3d 758, 761 (8th Cir. 2012).  The trooper contacted Mr. Riley and asked for his driver's license and for him to accompany him to his patrol vehicle.  Id.  Once in the patrol car, the trooper began to ask Mr. Riley questions about his travel itinerary.  Id.

During their exchange, the trooper observed that Mr. Riley seemed very nervous.  Id.  Mr. Riley's heart rate appeared to be elevated, as the trooper could see Mr. Riley's pulse in Mr. Riley's neck and stomach.  Id.  Mr. Riley was also fidgeting, and his breathing appeared to be shallow and rapid.  Id.  When the trooper asked Mr. Riley why he appeared so nervous, Mr. Riley indicated he had never been put in the backseat of a police vehicle during a routine traffic stop.  Id.  The trooper asked Mr. Riley whether he had ever been in trouble before and Mr. Riley represented that he had been arrested once for domestic

battery.  Id.  However, the trooper received information from dispatch
that Mr. Riley had a criminal history of several drug violations and several
felony arrests, including arrests for assaulting law enforcement.  Id.

After receiving Mr. Riley's criminal history from dispatch, the trooper
advised Mr. Riley that he believed Mr. Riley was lying and asked for consent to
search his car; Mr. Riley denied consent.  Id.  At this point, the trooper called
an off-duty dog handler to come to the location of the stop.  Id.  The drug dog
twice alerted to the presence of drugs in the trunk.  Id. at 762.  The officers
then searched the trunk and found approximately one kilogram of cocaine.  Id.
Mr. Riley was arrested and charged with possession with intent to distribute
500 grams or more of a mixture or substance containing a detectable amount
of cocaine.  Id.  Riley filed a motion to suppress the drug evidence seized from
his automobile. The district court denied the motion.  Id.

On appeal to the Eighth Circuit, Mr. Riley contended, among other
things, that the trooper lacked reasonable suspicion to detain him and search
his vehicle.  Id. at 763.  Relying on the district court's findings, the court found
that the trooper made several observations during the initial investigation that
supported the trooper's suspicion that criminal activity was afoot: (1) Mr. Riley
exhibited undue nervousness in the form of a visibly elevated heart rate,
shallow breathing, and repetitive gesticulations, such as wiping his face and
scratching his head; (2) Mr. Riley gave vague or conflicting answers to simple
questions about his itinerary; and (3) Mr. Riley misrepresented his criminal
history by omitting his drug violations and felony arrests.  Id.  The court held

27

that, given the totality of these circumstances, the trooper had reasonable, articulable, suspicion that Mr. Riley was engaged in unlawful activity.  Id.

Similarly, in United States v. Foley, a Nebraska State Highway Patrol Trooper observed a vehicle going 9 miles over the posted speed limit and initiated a traffic stop.  Foley, 206 F.3d at 804.  In response to the trooper's request, the driver, Stephanie Wilson, produced her driver's license and the passenger, Lee Foley, provided the car rental agreement and additional driver application.  Id.  During this exchange, the trooper observed an air freshener hanging from the rear-view mirror, which, in his experience, was suspicious to have in a rented vehicle.  Id.

While checking Ms. Wilson's license, the trooper engaged Ms. Wilson in general conversation regarding her departure location and ultimate destination. Id.  Ms. Wilson stated that they had been visiting Mr. Foley's son in California and were returning home to Indianapolis.  Id.  Ms. Wilson also stated that Mr. Foley had rented the vehicle.  Id.  After examining the car rental agreement, the trooper determined, however, that the vehicle was rented in someone else's name and Mr. Foley was only listed as the additional driver.  Id.

After additional questioning, Mr. Foley stated that he and Ms. Wilson had flown to California and that his daughter-in-law had rented the vehicle.  Id. Mr. Foley was, however, unable to provide the name of his daughter-in-law.  Id. The trooper noted that Mr. Foley seemed nervous and avoided eye contact.  Id. When the trooper asked Ms. Wilson how she and Mr. Foley had traveled to California, Ms. Wilson responded that they had driven.  Id.

28

His suspicions now aroused thoroughly, the trooper radioed for assistance, which arrived approximately eight minutes later. Id. The trooper informed Mr. Foley that, due to the discrepancies between his and Ms. Wilson's stories, he intended to conduct an exterior canine sniff of the vehicle. Id. at 804-05. The trooper then conducted the exterior sniff, to which his canine alerted. Id. at 805. Upon the alert, the trooper searched the vehicle and discovered a small quantity of marijuana and a large quantity of cocaine. Id. Thereafter, Mr. Foley was placed under arrest. Id. Approximately thirty minutes elapsed during the total pendency of the stop. Id.

On appeal to the Eighth Circuit, Mr. Foley argued that the detention was not reasonably related, in scope or duration, to the purpose of the initial traffic stop, thereby constituting an illegal detention. Id. However, the Eighth Circuit held that the totality of the circumstances justified the trooper's suspicion. Id. at 806. The court stated that the record revealed sufficient articulable facts, including the presence of a masking odor, Mr. Foley's nervous behavior, Mr. Foley's inability to recall the name of his purported daughter-in-law, and the vast divergence between his and Ms. Wilson's allegations regarding travel accommodations to California, to sustain reasonable suspicion. Id. Therefore, the court concluded, "any ostensible illegality was attenuated sufficiently so as to dissipate the resultant harm." Id. (citing Wong Sun, 371 U.S. at 488) (noting the distinction between evidence obtained through the "exploitation of . . . [an] illegality" and evidence obtained "by means sufficiently distinguishable to be purged of the primary taint").

29

While a suspect's nervous demeanor alone is not enough to establish reasonable suspicion, it is not the only factor that Officer Pekarek relied on when prolonging the traffic stop and conducting a canine search.  See Jones, 269 F.3d at 928-29 ("[W]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials") (quoting United States v. Barron-Cabrera, 119 F.3d 1454, 1461 (10th Cir. 1997); see also United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.").

Officer Pekarek testified that he had reasonable suspicion of further criminal activity because: (1) he observed Mr. Brown's nervous behavior—carotid artery beating out of his neck, heavy breathing, raised chest, starting random conversations, and changing the topic; (2) when asked about heroin, Mr. Brown began to laugh and can be seen scratching or rubbing his head, which Officer Pekarek testified that, in his training and experience, was a grooming gesture to calm nerves in a stressful situation; (3) Mr. Brown stated he was leaving the Cockatoo Gentlemen's Club, which is an establishment known for the sale and use of illegal drugs; (4) the fact that the vehicle was registered to Mr. Brown's brother in Sioux Falls when Mr. Brown lived four hours away in Rogers, Minnesota; and (5) Mr. Brown stated his destination for the evening was the "Lodge Motel," which was in the opposite direction of where Mr. Brown and Ms. Stokes were traveling.  Additionally, when being

questioned on whether these physical indications were normal signs of nervousness when being stopped by the police, Officer Pekarek stated that, in his experience, suspect's nerves tend to calm down once they find out they are only getting a ticket and are not going to jail; here, Officer Pekarek testified, Mr. Brown's nervousness continued to get increasingly worse as the traffic stop progressed.

Like <u>Riley</u>, in which the Eighth Circuit found that undue nervousness in the form of visibly elevated heart rate, shallow breathing, and repetitive gesticulations, in conjunction with other factors, supported reasonable suspicion of criminal activity, this court finds that Officer Pekarek had sufficient reasonable suspicion to prolong the traffic stop.  See <u>Riley</u>, 684 F.3d at 763.

Again, the reasonable articulable suspicion standard is a "fact-specific inquiry examining the totality of the circumstances" in a particular case. <u>United States v. Logan</u>, 362 F.3d 530, 533 (8th Cir. 2004) (citation omitted). Here, the totality of the circumstances provided a sufficient basis for Officer Pekarek to form a reasonable, articulable suspicion that Mr. Brown was engaged in further unlawful activity.  Therefore, Mr. Brown's traffic stop was not unreasonably prolonged and Mr. Brown's Fourth Amendment rights were not violated.

**B.    Whether Mr. Brown's Statements to Officer Pekarek Violated <u>Miranda</u> and Should be Suppressed**

Mr. Brown asserts statements he made to law enforcement after the dog sniff and after the unlawful seizure of evidence from the traffic stop are fruits of

31

the poisonous tree under the exclusionary rule and should be suppressed.
Docket No. 36, p. 12-13.  The court has concluded there was no Fourth
Amendment violation, so there is no "fruit of the poisonous tree" of a Fourth
Amendment violation.  Therefore, the court addresses only whether
Mr. Brown's statements were obtained in violation of the rule announced in
Miranda.

    "[A]n individual must be advised of the right to be free from compulsory
self-incrimination, and the right to the assistance of an attorney, any time a
person is taken into custody for questioning."  United States v. Griffin, 922
F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444
(1966)).  Accordingly, a Miranda warning is required prior to law enforcement
questioning an individual whenever the individual is in custody and is being
interrogated.  United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir.
2007).

    Some courts have placed the burden of proving that the defendant was
not in custody at the time of the interrogation on the government.  See United
States v. Charbonneau, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997).  Other
courts have placed the initial burden on the defendant to prove that he was "in
custody," with the burden of proof shifting to the government to prove a
voluntary waiver only after the defendant has sustained his initial burden.
See United States v. Moore, 104 F.3d 377, 392 (D.C. Cir. 1997) (Silberman, J.,
concurring) ("[I]t is the appellant's burden to establish factually that he was in

custody as a pre-condition to an argument that the Constitution protects his silence[.]").

The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, at *12 (W.D. Mo. Dec. 6, 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Brown's statements were not the subject of custodial interrogation on the government.  See United States v. McCarty, No. CR. 08-50035, 2008 WL 11404530, at *5 (D.S.D. Aug. 25, 2008) (placing burden on government to show defendant's statements were not the subject of custodial interrogation), report and recommendation adopted as modified, 2008 WL 11404531 (D.S.D. Oct. 7, 2008), aff'd, 612 F.3d 1020 (8th Cir. 2010).

A suspect is considered to be "in custody" either upon his or her formal arrest or "under *any other circumstances* where the suspect is deprived of his" or her "freedom of action in *any* significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer, 468 U.S. at 429).  The Eighth Circuit has set forth a list of non-exclusive indicia of custody that courts apply to determine whether a reasonable person would believe they were in custody:

> (1)whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to

> questions; (4) whether strong arm tactics or deceptive stratagems were
> employed during questioning; (5) whether the atmosphere of the
> questioning was police dominated; [and], (6) whether the suspect was
> placed under arrest at the termination of the questioning.

United States v. Laurita, 821 F.3d 1020, 1024 (8th Cir. 2016) (quoting Griffin,

922 F.2d at 1349).  Furthermore, when employing the Miranda custody

analysis, "[t]he ultimate inquiry must always be whether the defendant was

restrained as though he were under formal arrest."  United States v. Czichray,

378 F.3d 822, 827 (8th Cir. 2004).

Interrogation includes direct questioning or any practice reasonably

likely to evoke an incriminating response from a suspect.  See Rhode Island v.

Innis, 446 U.S. 291, 301 (1980); see also United States v. Head, 407 F.3d 925,

928 (8th Cir. 2005) ("Interrogation includes not only express questioning by law

enforcement officers, but also words or actions that officers should know are

reasonably likely to elicit an incriminating response from a suspect.").  The

"words or actions" of the police must be outside the scope of words and actions

that normally accompany the arrest and taking into custody of a defendant.

United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S.

at 301).

The government argues that, while law enforcement did not provide

Mr. Brown with a Miranda warning, there was no violation because Mr. Brown

was never placed under arrest and no interrogation occurred.  Docket No 39,

p. 11.  The government cites to United States v. Howard in support, stating law

enforcement officers need not provide Miranda warnings when conducting

roadside questioning resulting from a routine traffic stop because such

34

questioning does not constitute a "custodial interrogation." <u>United States v. Howard</u>, 532 F.3d 755, 761 (8th Cir. 2008).  Furthermore, routine on-the-scene questioning does not present the compelling atmosphere inherent in the process of in-custody interrogation.  <u>Id.</u>  The court agrees.

The Supreme Court in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984) addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of <u>Miranda</u>.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that <u>Miranda</u> warnings are required.  <u>Berkemer</u>, 468 U.S. at 434-35.  However, during the traffic stop itself and prior to arrest, the Court held that <u>Miranda</u> applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' "  <u>Id.</u> at 440-41 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (<em>per curiam</em>).

The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away once stopped.  <u>Id.</u> at 436.  However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in <u>Miranda</u>.  <u>Id.</u> at 436-38.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  <u>Id.</u> at 437.  Also, the interrogation takes place in public, subject to observation by pedestrians and other motorists, thus

35

reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438. Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The Berkemer Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that Miranda warnings were required: period of time elapsed between the traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop. Id. at 441-42.

While both Officer Pekarek and Officer Osborne testified that they did not provide Miranda warnings to Mr. Brown or Ms. Stokes, neither officer placed either of them in handcuffs or made a formal arrest. Additionally, the only physical contact between law enforcement and Mr. Brown was a search of Mr. Brown's person after Officer Pekarek's dog alerted. Therefore, because Mr. Brown was never handcuffed, restrained from movement, placed under arrest at any point during the encounter, nor were any strong-arm tactics or deceptive stratagems employed during law enforcements questioning, the court finds that Mr. Brown was not in custody for purposes of a Miranda analysis.

Additionally, the questions posed by Officer Pekarek did not constitute interrogation.  As Officer Pekarek was completing his search, Mr. Brown shouted to Officer Pekarek, "you all up in that motherf*cker, ain't you," describing how thoroughly Officer Pekarek was searching the vehicle.  (38:15, Exhibit 1B).  In response, Officer Pekarek stated to Mr. Brown, "I am trying to figure out whose gun this is."  (38:17, Exhibit 1B).  After this statement, Mr. Brown replied, "mine . . . I am not a violent offender.  In the State of South Dakota, I can have it."  (38:25, Exhibit 1B).  Officer Pekarek's statement—not a question—was not interrogation when viewed in the context of the exchange initiated by Mr. Brown.

In Innis, 446 U.S. at 302, the United States Supreme Court held that a conversation between two police officers in the presence of a Mirandized suspect did not amount to interrogation.  Id.  The suspect, Mr. Innis, had been arrested in connection with the robbery of a taxicab driver.  Id. at 293.  The weapon used in the robbery was a sawed-off shotgun.  Id.  A few days earlier, another taxicab driver had disappeared after being dispatched to pick up a customer.  His body was later found, having been killed by a shotgun blast to the head.  Id.  The second cab driver reported to the police station to give a description of the man who had robbed him and identified a photo of Mr. Innis. Id.  Mr. Innis was arrested after he was spotted on the street by a patrolman. Id. at 294.

Mr. Innis was advised of his Miranda rights at least twice before he was transported to the police station.  Id.  Mr. Innis indicated he wanted to speak

with a lawyer.  Id.  En route to the station, the two officers in the patrol car did not directly address Mr. Innis, but they had a conversation in the patrol car between themselves regarding the shotgun that had been used during the robbery, which had not been found.

One patrolman remarked to the other that the area where the second taxicab robbery had occurred was near a school for handicapped children, and "God forbid one of them might find a [loaded] weapon . . . and they might hurt themselves."  Id. at 294-95.  The other officer concurred, remarking they should continue to search for the weapon.  Id. at p. 295.  The second officer went even further, expressing concern that "it would be too bad if [a little girl] would pick up the gun, maybe kill herself."  Id.  At that point, Mr. Innis interrupted the conversation and told the officers to turn the patrol car around so he could show the officers where the gun was located.  Id.  They returned to the scene of the crime, and Mr. Innis was again advised of his Miranda rights, but Mr. Innis indicated he wanted to get the gun out of the way because of the children in the area.  Id.

Mr. Innis was convicted of several counts, including kidnapping, robbery, and the murder of the first taxicab driver.  He unsuccessfully moved to suppress the shotgun and statements he made to the patrol officers.  Id. at 296.  On appeal to the Rhode Island Supreme Court, however, that court found that the conversation between the patrol officers amounted to an interrogation of Mr. Innis and set aside Mr. Innis's conviction.  Id.  The United States Supreme Court disagreed.

38

The Court explained that the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to "express questioning or its functional equivalent." <u>Id.</u> at 300-01.  This includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

> But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

<u>Id.</u> at 301-02.

Concluding that what occurred did not fit the definition, the Court noted that (1) the conversation was nothing more than a dialogue between the two officers to which no response from Mr. Innis was invited; and (2) it could not be fairly concluded that Mr. Innis was subjected to the functional equivalent of questioning because the patrolmen could not have known their conversation was reasonably likely to elicit an incriminating response from Mr. Innis.  <u>Id.</u> This was so because there was nothing in the record to show Mr. Innis was particularly susceptible to an appeal to his conscience regarding the safety of handicapped children, or that the patrolmen knew Mr. Innis was unusually disoriented or upset at the time of his arrest.  <u>Id.</u> at 302-03.

> The case thus boils down to whether, in the context of their brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond.

Id. at 303.

Here, like the remark made by the officer in Innis that "it would be too bad if [a little girl] would pick up the gun, maybe kill herself," Id. at 295, Officer Pekarek's statement, "I am trying to figure out whose gun this is," was merely a response to Mr. Brown and nothing more than conversation or off-hand dialogue.  Like Innis, this court cannot say that Officer Pekarek should have known that this statement, in response to Mr. Brown's remark about the search, was reasonably likely to elicit an incriminating response.

Also instructive is the Eighth Circuit's holding in United States v. Cordova, 990 F.2d 1035, 1036-38 (8th Cir. 1993).  In that case, police obtained a search warrant for, inter alia, Mr. and Mrs. Cordova's residence.  Id.  When they arrived to execute the search warrant, the officers arrested Mr. Cordova and asked him whether there were drugs in the house.  Id.  He told the officers he had a "personal stash" of heroin in the bedroom.  Id.  The officers retrieved the heroin from the bedroom and then approached Mrs. Cordova, who was sitting in the living room.  Id.  They asked her if her husband had any additional heroin anywhere in the house.  Id.  Mrs. Cordova subsequently informed officers that she had drugs hidden inside her vagina.  Id.  Later, she moved to suppress her statements pursuant to Miranda.  Id.

The Eighth Circuit refused to suppress, noting that the officer had asked her about additional drugs related to her husband, not Mrs. Cordova.  Id.  The fact that Mrs. Cordova then identified drugs which she herself possessed was characterized by the court as a voluntary statement, not a response to

interrogation likely to produce an incriminating response as to her.  Id. Further, the court noted that the officer did not ask Mrs. Cordova whether she owned either the drugs already found or the additional drugs for which they were looking; nor did the officer ask about her association with the drugs.  Id. In such a case, where the statement itself was uncoerced, the court held Miranda has no application.  Id.

Just as the officers in Cordova did not ask whether Mrs. Cordova owned the drugs found, possessed any additional drugs, or what her association with the drugs was, Officer Pekarek never asked Mr. Brown if the firearm was his, if there were any other firearms in the vehicle, or what his association with the firearm was.  In fact, Officer Pekarek did not ask any question.  Here, Officer Pekarek simply responded to Mr. Brown by expressing his goal of discovering who owned the firearm.  It was at that point Mr. Brown, uncoerced, chose to admit ownership of the firearm.

"Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer."  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citation omitted); see also Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989).  Here, this entire conversation was initiated by Mr. Brown; as Officer Pekarek was completing his search, Mr. Brown shouted to Officer Pekarek, "you all up in that motherf*cker, ain't you," describing how thoroughly Officer Pekarek was searching the vehicle.  Only after Mr. Brown's remark did Officer Pekarek state his goal of trying to discover the owner of the firearm.  Thus, Mr. Brown's

41

admission came only after a conversation *he* initiated with Officer Pekarek.  At

no point was Mr. Brown forced, coerced, or tricked into making this statement;

rather, this admission by Mr. Brown was made of his own volition.  Therefore,

the court finds that the statement Officer Pekarek made to Mr. Brown was not

interrogatory.

Because Mr. Brown was not in custody nor were the questions posed to

him interrogatory in nature, Officer Pekarek and Officer Osborne were not

required to give <u>Miranda</u> warnings.  Accordingly, the court finds that

Mr. Brown's statements to law enforcement were made of his own volition, were

not obtained in violation of the Fifth Amendment, and should not be

suppressed.

**C.    Evidence Obtained in the Search of Mr. Brown's Vehicle Should Not Be Suppressed**

Under the Fourth Amendment's exclusionary rule, evidence obtained in

violation of the Fourth Amendment cannot be used in a criminal proceeding

against the victim of an illegal seizure.  <u>Mapp v. Ohio</u>, 367 U.S. 643, 654

(1961).  This includes evidence which is the "fruit" of such illegal conduct.

<u>Wong Sun</u>, 371 U.S. at 487-88.

Searches conducted without prior judicial approval "are per se

unreasonable under the Fourth Amendment—subject only to a few specifically

established and well-delineated exceptions."  <u>Arizona v. Gant</u>, 556 U.S. 332,

338 (2009) (citation omitted).  It is well settled that searches should be

conducted within the judicial process unless a recognized exception applies.

<u>Katz v. United States</u>, 389 U.S. 347, 357 (1967).  If the government cannot

prove a valid exception, then the search remains presumptively invalid, and the evidence must be suppressed.  Id.

Here, Mr. Brown argues that no valid exception applies to the search of his vehicle; a warrant was not obtained, he did not consent to the search, and the basis for the search—an alert by a drug dog—occurred after Mr. Brown's traffic stop had been unreasonably prolonged.  Docket No. 36, p. 12.  The court disagrees.

Because Officer Pekarek had sufficient reasonable suspicion to prolong the traffic stop and conduct a canine search, once the canine alerted to the odor of narcotics in the vehicle Officer Pekarek had probable cause to search the entire vehicle.  United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010) (an alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle).  Mr. Brown has not challenged Reno's reliability and training or whether Reno alerted or indicated to the odor of drugs in the car.  Thus, the Fourth Amendment's exclusionary rule does not apply, and the evidence obtained by Officer Pekarek, namely the firearm and Mr. Brown's statements, were not obtained in violation of Mr. Brown's Fourth Amendment rights.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Vance Warkata Brown's motion to suppress [Docket No. 35] be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 19th day of November, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge