UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VANCE WARKATA BROWN,<br><br>Defendant. | 4:21-CR-40066-01-KES<br><br>ORDER ADOPTING IN PART AND REJECTING IN PART THE REPORT AND RECOMMENDATION AND GRANTING BROWN'S MOTION TO SUPPRESS |

Defendant, Vance Warkata Brown, is charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(2), and 922 (g)(9). Docket 1. Brown moves to suppress all evidence obtained during a search of his vehicle, arguing that this evidence was obtained in violation of the Fourth Amendment to the United States Constitution. Dockets 35-36. He also moves to suppress all statements made by him after the deployment of a police canine and the seizure of evidence from his vehicle, arguing that these statements are fruit of the poisonous tree. *Id.* The motion was referred to a United States magistrate judge for a report and recommendation under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, the magistrate judge recommended that Brown's motion to suppress be denied. Docket 45. Brown objects to the magistrate judge's Report and Recommendation. Docket 49. For the reasons set forth below, the court adopts in part and rejects in part the Report and Recommendation and grants Brown's motion to suppress.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980) (holding dispositive motions under 28 U.S.C. § 636(b)(1) are subject to de novo review by the district court). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTUAL BACKGROUND

According to the testimony given and the exhibits offered at the evidentiary hearing, the pertinent facts are as follows:

In the early morning of November 24, 2020, Kyler Pekarek, then an officer and canine handler with the Yankton Police Department, made a traffic stop of a vehicle that he observed make a turn violation. Docket 44 at 4-7. Officer Pekarek made contact with the driver, identified as Vance Warkata Brown, and a female passenger. *Id.* at 7. Officer Pekarek informed them that he would be issuing a warning for the turn violation, and he asked Brown to

accompany him back to his patrol vehicle. *Id.* at 8-9. Sometime between the beginning of the stop and when Officer Pekarek and Brown walked back to Officer Pekarek's vehicle, another officer had arrived and parked behind Officer Pekarek's vehicle, and then was standing near the police vehicles. Exhibit 1B at 1:58.[1]

As they approached his patrol car, Officer Pekarek mentioned to Brown that his dog was in the back seat, and Brown immediately took several steps away from the car and expressed fear of being near the dog, saying "I'll just stand right here. I'll sit on the ground. I don't want to [unintelligible] no dog." *Id.* at 2:06-2:15. Officer Pekarek reassured Brown about the dog, and immediately after Brown sat in the front seat of the patrol car, he looked back at the dog and said, "Please don't bark." *Id.* at 2:31. After Officer Pekarek again explained the reason he stopped Brown, Brown looked back at the dog a second time and said, "Please, please puppy don't." *Id.* at 3:08.

While Officer Pekarek ran a check on Brown's identification, he asked Brown his reason for being in the area, and Brown answered that the passenger was working at the Cockatoo. *Id.* at 3:15. Brown then asked, "Can you help us get to the Lodge motel?" *Id.* at 3:20. Officer Pekarek asked "which one," and Brown appeared to answer, "uh . . . she knows." *Id.* at 3:25. Officer Pekarek asked if Brown meant the Econolodge, and Brown answered, "That's it." *Id.* at 3:35. Officer Pekarek then told Brown that the Econolodge was

---

[1] Exhibit 1B is video footage from Officer Pekarek's body-worn camera.

located "all the way back on Broadway," to which Brown responded, "I don't think that's it. We're following the GPS." *Id.* at 3:38. Then Brown remarked that he did not know the turn violation for which he was stopped was a traffic violation. *Id.* at 3:41. Through additional questions, Officer Pekarek learned that the car belonged to Brown's brother, who lived in Sioux Falls, while Brown lived in Rogers, Minnesota. *Id.* at 4:03-4:55. He also learned that Brown had been staying with his brother since "sometime last week." *Id.* at 5:00.

Next, Officer Pekarek asked Brown if he knew his license was revoked, Brown responded that he did not, and Officer Pekarek informed Brown that he would be writing him a ticket for that, though normally he would go to jail for it. *Id.* at 7:01-7:27. Officer Pekarek then returned to questions about the car, asking Brown if he used his brother's car often. *Id.* at 8:43. Brown responded, "Anytime I need it. Sometimes I take his mother to the grocery store, or doctors' appointments. She's an older person so, don't nobody really help her get around like that. I try to help the best way I can." *Id.* at 8:45-9:08.

Then, while still working on the ticket for driving with a revoked license, Officer Pekarek said, "Like I said, my dog's back there, so is there anything in the vehicle [unintelligible] needs to know about at all?" *Id.* at 9:33. Brown said there was not, and then Officer Pekarek told Brown that if there was just a weed pipe or less than an ounce of weed, he would only get a ticket, not go to jail, and Brown said nothing like that was in his car. *Id.* at 9:37-9:52. Officer Pekarek asked about pills, and Brown disclosed that he had painkillers with

4

him and began to take them out of his pocket, but Officer Pekarek indicated he was not concerned about that type of pill. *Id.* at 10:00.

Officer Pekarek next asked about heroin, and Brown looked at Officer Pekarek with a startled expression, laughed, said "no," and then ran his hand over the top of his head. *Id.* at 10:10. Officer Pekarek then asked about cocaine, Brown said "no," and then said, "We just came up here to work. That's it. Well, she did. Hopefully I can get a job there as bouncer." *Id.* at 10:18. Officer Pekarek asked about methamphetamine, and Brown again said "no." *Id.* at 10:27. Then, Officer Pekarek asked if he could search the vehicle, Brown asked whether he was allowed to refuse, and when he was told that he could, Brown said, "No. Trying to get to the hotel because it's two in the morning. Tired as hell." *Id.* at 10:35. Officer Pekarek then placed the unfinished ticket for the revoked license on top of his car's dashboard. *Id.* at 10:50; Docket 44 at 31-32. Officer Pekarek then asked for consent to deploy his dog around Brown's vehicle, and Brown said "no." Exhibit 1B at 11:05.

Officer Pekarek then deployed his dog around Brown's vehicle, and the dog indicated to the odor of drugs at the driver's side door. *Id.* at 12:36-12:56. Based on that indication, Officer Pekarek told Brown that he was going to search his vehicle. *Id.* at 13:20. Officer Pekarek then explained to Brown that he asked him about drugs because "your carotid was going, you're breathing heavy, you're rigid, . . . you're bringing up other conversation, you're changing the topic, stuff like that." *Id.* at 15:33. Brown asked him to "say that again," and Officer Pekarek repeated the first three of these reasons, adding "you

5

probably don't even realize it because it's physiological stuff, that's it." *Id.* at 15:43. When Officer Pekarek searched Brown's vehicle, he found a black, forty-five caliber high point handgun. Docket 44 at 19; Exhibit 1B at 27:35. After he found the gun, Officer Pekarek said to Brown, "I'm trying to figure out whose gun it is." Exhibit 1B at 38:18. Brown said the gun was his. *Id.* at 38:25. Brown then explained that, because he was not a violent offender and did not have drug convictions, he was allowed to possess the gun. *Id.* at 38:27-38:44. Eventually, Officer Pekarek completed the citation for driving with a revoked license and released Brown from the scene. *Id.* at 1:00:00-1:04:10.

In the police report, Officer Pekarek justified the canine deployment because of Brown's nervousness.[2] *See* Docket 44 at 33-34. At the evidentiary hearing, Officer Pekarek justified the canine deployment based on the physiological observations he provided to Brown during the stop, and he also provided reasons that he did not mention to Brown that night or include in his police report, including: that Brown was coming from the Cockatoo Gentlemen's Club, which Officer Pekarek testified was known for the sale and use of illegal drugs;[3] that Brown was "way off route for the Lodge that he was going to"; that Brown said he could use his brother's vehicle whenever he wanted, despite living four hours away from his brother; and Brown's

---

[2] The police report was not offered as evidence at the evidentiary hearing, but Officer Pekarek testified to its contents. *See* Docket 44 at 33-34.
[3] Officer Pekarek noted in the police report that Brown and his passenger were coming from the Cockatoo Gentlemen's Club, but he did not indicate this as a reason for the canine deployment. Docket 44 at 33-34, 59-60.

"grooming gesture" of scratching his head when asked about heroin. *Id.* at 11, 14, 16-18. The government does not list any of these reasons in its Memorandum in Resistance to Defendant's Motion to Suppress. *See* Docket 39. It merely states that Officer Pekarek had reasonable suspicion to prolong the stop. *Id.* at 9.

The magistrate judge concluded that Officer Pekarek should have completed the tasks related to Brown's lane change violation and his driving with a revoked license "much sooner than he did." Docket 45 at 20. But the magistrate judge concluded that the "traffic stop was not unreasonably prolonged and Mr. Brown's Fourth Amendment rights were not violated" because Officer Pekarek had reasonable suspicion that Brown was engaged in unlawful activity. *Id.* at 31. Because there was no Fourth Amendment violation, the magistrate judge concluded that Brown's statements after the canine deployment and search were not "fruit of the poisonous tree." *Id.* at 31-32. The magistrate judge also concluded that these statements were not obtained in violation of *Miranda*. *Id.* at 42. Thus, the magistrate judge recommended that Brown's motion to suppress be denied. *Id.* at 43.

## DISCUSSION

Brown objects to several of the magistrate judge's factual findings and the magistrate judge's legal conclusion that Officer Pekarek had reasonable suspicion to prolong the traffic stop and deploy his canine. Docket 49 at 2-9. Brown also argues that statements he made to Officer Pekarek after the canine

deployment and search of his vehicle should be suppressed as fruit of the poisonous tree. *Id.* at 9.

### A. Brown's Factual Objections

1. Officer Pekarek's Testimony Regarding Signs of Nervousness and Increasing Nervousness

Brown's first factual objection concerns Officer Pekarek's testimony about the physiological signs of Brown's nervousness, which included a visibly pulsating carotid artery, heavy breathing, a rigid body, and staring straight ahead. *Id.* at 2. Brown claims that the magistrate judge "did not directly address whether these alleged signs were in fact present based on the video, but rather appears to rely on Officer Pekarek's testimony," and that "the videos contradict Officer Pekarek's description and show that he was not exhibiting these" signs. *Id.*; *see also* Docket 36 at 8.

A court is entitled to "give weight to [a] magistrate judge's credibility determination." *United States v. Scares the Hawk*, 683 F. Supp. 2d 1036, 1037 (D.S.D. 2009) (quoting *United States v. Martinez-Amaya*, 67 F.3d 678, 681 (8th Cir. 1995)). But here, the magistrate judge did not make a specific credibility determination regarding Officer Pekarek's testimony, and the Report and Recommendation does not address Brown's argument that the video evidence contradicts Officer Pekarek's testimony about the physical signs of nervousness. Although the Report and Recommendation cites to the body-worn camera video in its discussion of the facts, its discussion of the physical signs of Brown's nervousness does not cite to the video. *See* Docket 45 at 4-5. Instead, the magistrate judge relies only on Officer Pekarek's testimony to

8

establish that these signs of nervousness were present. *Id.* The court has reviewed the video evidence, and it finds that some of these signs of nervousness are not visible.

Officer Pekarek testified that he could see Brown's "heart beating up the side of his neck."  Docket 44 at 12. But Brown is wearing a letterman-style coat with a thick collar that covers much of his neck throughout this encounter. Although there may be instances where a person's heartbeat could be visible to another person while not being discernable on a video, it is not credible that Officer Pekarek could see Brown's "heart beating up the side of his neck" through the thick collar of Brown's coat. Thus, the court finds that Officer Pekarek was not able to see Brown's heartbeat in his neck.

Officer Pekarek also testified that Brown's "chest appeared to be rising and falling at a rapid rate." *Id.* A few deep breaths and long exhales from Brown are visible and audible just after Brown looks back at the dog and says "Please, please puppy don't." Exhibit 1B at 3:08. At no other time in the video is Brown's breathing audible or is Brown's chest visibly rising and falling. In fact, Brown's coat is protruding away from his body, obstructing a direct view of his chest. Based on this video evidence, the court also finds that Officer Pekarek was not able to see Brown's chest rapidly rising and falling.

Another sign of nervousness Officer Pekarek said he observed was that "there were . . . times during the silence where [Brown's] body appeared to be rigid and he was staring straight ahead." Docket 44 at 12. The court finds that Brown does largely stare straight ahead when not engaged in conversation with

9

Officer Pekarek, and that Brown's posture could be described as rigid during these lulls in conversation.

Brown also objects to the magistrate judge's "factual finding[] that accept[s] Officer Pekarek's testimony . . . that Brown's nerves 'continued to get increasingly worse as the traffic stop progressed.'" Docket 49 at 2 (quoting Docket 45 at 5-6); *see also* Docket 45 at 31. As described above, the court does not credit Officer Pekarek's testimony regarding Brown's visible pulse and rapid breathing. For the remaining signs of nervousness—rigid body posture and staring straight ahead—the court finds, based on the video evidence, that these remained constant as the traffic stop progressed.

2. Officer Pekarek's Testimony Regarding the "Grooming Gesture"

Next, Brown's objects to the magistrate judge's "factual finding[] that accept[s] Officer Pekarek's testimony that Brown made a 'grooming gesture' when asked about heroin." Docket 49 at 2. The body-worn camera video does show that Brown ran his hand over his head when Officer Pekarek asked him about heroin. Exhibit 1B at 10:10. Officer Pekarek described a grooming gesture as "a way to relieve stress," and that, based on his training and experience, Brown's grooming gesture demonstrated that being asked about heroin was "a trigger question" for him. Docket 44 at 15, 34.

In conducting a reasonable suspicion analysis, a "court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity." *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001). But a court does not have to simply

10

defer to an officer's conclusion regarding the meaning of certain behaviors. *See United States v. Beck*, 140 F.3d 1129, 1138-39 (8th Cir. 1998) (rejecting presence of fast-food wrappers in car as indicative of drug trafficking because officer "offered no basis for his supposition . . . from which any reviewing authority can gauge the reasonableness of his assumption."); *see also United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) ("[A]n officer and the [g]overnment must do more than simply label a behavior as 'suspicious' to make it so. The [g]overnment must also be able to either articulate why a particular behavior is suspicious or logically demonstrate . . . that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.").

Here, Officer Pekarek conceded that there "are completely normal reasons someone might scratch their head[,]" as Brown did, but that his training and experience enabled him to differentiate between "grooming gestures" and  "normal behavior." Docket 44 at 34. According to Officer Pekarek, he can distinguish these by comparison to "[t]he baseline," which is a "[n]ormal question[] that . . . shouldn't cause any difficulty to answer." *Id.* at 34-35. Officer Pekarek did not elaborate further on which questions he considered "normal," and it is unclear how he would know a "baseline" for Brown, a person he had never previously met. *See Beck*, 140 F.3d at 1139 (concluding that "any suspicion associated with [defendant's] nervous demeanor . . . to be, at best, minimal" because the officer "had never previously met [defendant] and therefore had no measure by which to gauge [his] behavior

11

during the traffic stop with his usual demeanor"). Alternatively, Officer Pekarek offered that "[i]f the scratching of the head manifests during all questions, it would be a normal response." Docket 44 at 35. Because Officer Pekarek was unable to provide a basis from which the court could "gauge the reasonableness of his assumption" that this was a "grooming gesture" and not a "normal" gesture, the court does not include this behavior in its reasonable suspicion analysis. *See Beck*, 140 F.3d at 1139.

### 3. Officer Pekarek's Testimony Regarding Other Indicia of Criminal Activity

Brown's final factual objection concerns the magistrate judge's finding that Officer Pekarek developed reasonable suspicion based, in part, on Brown coming from the Cockatoo, which he testified was a known location for the sale of drugs, and on Brown's statement he could use his brother's car whenever he wanted, despite Brown living four hours away from where his brother lived. Docket 49 at 3-4. Brown argues that because these reasons were not included in the list of justifications Officer Pekarek provided to him during the stop and they were not included in Officer Pekarek's written report about the stop, that Officer Pekarek did not actually consider these facts in concluding that he had reasonable suspicion to prolong the traffic stop. *Id.*

To determine whether reasonable suspicion exists, courts "consider 'what the officer reasonably knew at the time,' rather than assessing the existence of reasonable suspicion 'with the vision of hindsight.' " *United Sates v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). There is, however, no requirement that officers provide all

the factors giving rise to reasonable suspicion during the traffic stop. The court finds that the evidence does support Officer Pekarek's testimony that he relied on Brown coming from the Cockatoo and Brown's statements about using his brother's car in determining that he had reasonable suspicion. Though Officer Pekarek did not specifically list coming from the Cockatoo as a reason for suspicion in his report, the fact that Brown was coming from there was included in the report. Docket 44 at 59. The video evidence also shows that Officer Pekarek asked several questions regarding the car's ownership, the relationship between Brown and the car's owner and between the car's owner and the passenger, where each of them lived, and the frequency with which Brown used the vehicle. Exhibit 1B at 4:03-4:55; 8:43-9:08. This supports Officer Pekarek's testimony that he considered this arrangement to be unusual.

### B. Whether Officer Pekarek Had Reasonable Suspicion to Prolong the Traffic Stop

An officer can stop a vehicle when there is "probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop "that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). To prolong the traffic stop beyond the time reasonably needed to fulfill the stop's mission, an officer needs reasonable suspicion of additional unlawful activity. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

The magistrate judge found that the original mission of the traffic stop was Brown's lane change violation, but that this mission was later expanded to

13

include addressing Brown driving with a revoked license. Docket 45 at 15. The magistrate judge also found that "a reasonable police officer would, and should, have completed the tasks tied to investigating and writing a citation . . . much sooner than [Officer Pekarek] did." *Id.* at 20. Neither party objects to these findings. *See* Docket 49. Instead, Brown objects to the magistrate judge's conclusion that Officer Pekarek had reasonable suspicion to prolong the traffic stop, which allowed for the canine deployment and subsequent search of the vehicle. Docket 49 at 5.

Reasonable suspicion is assessed on the totality of the circumstances, and it requires " 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer's "hunch," however, is not enough. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Instead, an officer must have a "particularized and objective basis" for suspecting that a person is engaged in criminal activity. *Id.* at 396-97 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

1. <u>Applicability of *Barrera* and *Peralez*</u>

Brown objects to the magistrate judge's conclusion that reliance on *United States v. Barrera*, 2020 WL 6268395 (D.S.D. Oct. 10, 2020) and *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008) is "misplaced" and "inapposite," respectively. Docket 49 at 5-7. In *Barrera*, a magistrate judge recommended that the motion to suppress be granted because the officer

14

prolonged the traffic stop beyond the time it should have taken to complete the warning ticket and the officer did not have the reasonable suspicion necessary to prolong the stop. 2020 WL 6268395 at *4-5. The magistrate judge here found that reliance on *Barrera* is "misplaced" because in *Barrera* the officer did not learn anything suspicious about the defendant's driver's license, whereas here, Officer Pekarek learned that Brown's license had been revoked. Docket 45 at 25-26. But as the magistrate judge found, and to which neither party objects, Officer Pekarek should have completed the citation for the driving with a revoked license "much sooner than he did." *Id.* at 20. Thus, the question here is the same as it was in *Barerra*: did the officer have reasonable suspicion to prolong the stop beyond the time needed to complete the mission of the traffic stop? Thus, although *Barrera* is not binding, the court rejects the magistrate judge's finding that reliance on *Barrera* is "misplaced."

In contrast, in *Peralez*, the question was whether the "blended process" the officer used, "interspersing drug interdiction questions with the routine processing of a traffic stop," prolonged the stop. 526 F.3d at 1119. Here, the magistrate judge has already made a finding that the stop was prolonged. The only remaining question is whether Officer Pekarek had reasonable suspicion to do so. Thus, the court adopts the magistrate judge's finding that *Peralez* is "inapposite." Docket 45 at 25.

      2. Reasonable Suspicion Analysis

The magistrate judge relied on the following factors in determining that Officer Pekarek had reasonable suspicion to prolong the traffic stop: (1)

15

Brown's nervous behavior, which included rigid body posture, staring straight ahead, and changing the topic of conversation;[4] (2) coming from the Cockatoo, a place known to Officer Pekarek for illegal drug activity; (3) traveling off route for his destination; (4) and the car being registered to Brown's brother in Sioux Falls, while Brown lived four hours away.

Nervousness, when combined with "several other more revealing facts can generate reasonable suspicion." *Jones*, 269 F.3d at 928. "Generally, however, 'nervousness is of limited significance in determining reasonable suspicion.' " *Id.* (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994). This is especially true when the nervousness could be due to other factors, or when "the alleged signs of nervousness are not the kind of unusual, exceptional, or more objective manifestations of nervousness[.]" *Id.* at 929 (internal quotation marks omitted). Here, Brown's nervousness includes rigid body posture and staring straight ahead when not engaged in conversation with Officer Pekarek. These are not "unusual" or "exceptional" manifestations of nervousness, particularly considering that Brown was sitting directly in front of Officer Pekarek's dog, of which he was afraid.

Regarding Brown changing the topic of conversation, Officer Pekarek testified that after being asked about cocaine, Brown "changed the topic to they

---

[4] The magistrate judge also relied on Brown's "carotid artery beating out of his neck, heavy breathing, [and] raised chest" as part of Brown's nervous behavior and on the "grooming gesture" in concluding that Officer Pekarek had reasonable suspicion to prolong the traffic stop. Because of the court's factual findings regarding these behaviors, the court does not include them in its reasonable suspicion analysis.

16

were down here for work[,] and he was hoping to find a job at the Cockatoo as a bouncer." Docket 44 at 14; *see also id.* at 16 ("[W]hen asked about cocaine . . . he diverted the conversation to the Cockatoo and how he hopes to get a job[.]"). A review of this exchange on the body-worn video, however, does not support Officer Pekarek's testimony that Brown was "divert[ing] the conversation." Officer Pekarek asked whether his dog would find anything in his vehicle, and Brown said no. Exhibit 1B at 9:33. Officer Pekarek asked whether there was any weed in the vehicle, and Brown said no. Exhibit 1B at 9:37. Officer Pekarek asked if there were any pills, and Brown disclosed he had pain pills with him. Exhibit 1B at 10:00. Officer Pekarek asked whether there was any heroin in the vehicle, and Brown said no. Exhibit 1B at 10:10. Officer Pekarek then asked if there was any cocaine, and Brown said, "No, no, no. We just came up here to work, that's it. Well, she did. Hopefully I can get a job there working as a bouncer." Placing Brown's statement about working at the Cockatoo in the context of the full conversation, Brown was trying to demonstrate that, just as he stated earlier in response to a question from Officer Pekarek, they were out that night because of work, not drugs. Thus, the court concludes that any suspicion arising from Brown's nervous demeanor was, at best, minimal. *See Beck,* 140 F.3d at 1139.

The remaining facts—coming from a place known for drug activity, being off-route for the motel, and the circumstances surrounding Brown's use of his brother's car—are of the type that have been relied on to establish reasonable suspicion in previous cases. *See United States v. Collins,* 883 F.3d 1029, 1032

17

(8th Cir. 2018) ("Factors that may reasonably lead an experienced officer to investigate include . . . location of the suspect parties . . . ." (quoting *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016))); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) ("[R]easonable suspicion [can] derive from 'unusual or suspicious travel plans.' " (quoting *Beck*, 140 F.3d at 1139)); *Jones*, 269 F.3d at 928 ("[A]n inconsistent answer regarding present destination . . . casts suspicion and doubt on the legitimacy of the activity being investigated.").

Viewing these facts in context, however, shows that they are less suspicious than they may first appear. For example, though Officer Pekarek testified that the Cockatoo was a place known for drug activity, he had no information to suggest that Brown's visit to the club conformed with patterns of drug activity or that anyone involved in this drug activity was present at the club when Brown was present. *Compare Collins*, 883 F.3d at 1033 (reasonable suspicion where defendant visited known site of drug sales in a manner that conformed with drug distribution and at a time when known drug dealer was present), *with United States v. Crawford*, 891 F. 2d 680, 682 (8th Cir. 1989) (no reasonable suspicion where defendant entered apartment building where known drug dealer lived because no evidence was presented to show that defendant entered dealer's apartment or had any other connection to dealer).

An examination of the two cases that the magistrate judge primarily relied on in concluding that Officer Pekarek had reasonable suspicion—*Riley*, 684 F.3d 758, and *United States v. Foley*, 206 F.3d 802 (8th Cir. 2000)—

18

likewise reveal that the circumstances here are less suspicious than those previously found to constitute reasonable suspicion. In *Riley*, the court found that Riley "exhibited undue nervousness in the form of a visibly elevated heart rate, shallow breathing, and repetitive gesticulations, such as wiping his face and scratching his head." 684 F. 3d at 763 (internal quotation marks omitted). These signs of nervousness are more "exceptional" than the rigid posture and staring straight ahead that Brown exhibited during lulls in his conversation with Officer Pekarek. *See Jones*, 18 F.3d at 929. In addition to providing inconsistent answers about his travel plans, Riley also misrepresented that a domestic battery arrest was the extent of his criminal history. *Riley*, 684 F.3d at 763. The officer knew, however, that Riley had several drug violations and felony arrests, including for assaulting a law enforcement officer. *Id.* In contrast, when Officer Pekarek prolonged the stop, he was not aware of any criminal history for Brown and had no knowledge that Brown had made any misrepresentations to him.[5]

In *Foley*, the name on the rental agreement did not match either of the individuals in the car. 206 F.3d at 804. Foley indicated that his daughter-in-law had rented the vehicle in her name, but he could not remember his

---

[5] Officer Pekarek later received information from dispatch that Brown had a criminal history and learned that Brown's relationship to the passenger was not as Brown originally described. But Officer Pekarek did not have this information until after he searched Brown's car. This information, then, could not have been used to establish reasonable suspicion. *See Slater*, 979 F.3d at 629 (courts must "consider what the officer reasonably knew at the time, rather than assessing the existence of reasonable suspicion with the vision of hindsight" (cleaned up)).

daughter-in-law's name. *Id.* Foley and the driver provided different accounts of how they traveled to California and different reasons for their visit to the state. *Id.* Foley himself provided two different reasons for their visit. *Id.* Here, Brown appeared unsure about which motel he was trying to find and where this motel was located. But any suspicion raised by this is partly mitigated by Officer Pekarek's knowledge that Brown was not from the area. Similarly, though Officer Pekarek found Brown's statements about his use of his brother's car to be odd because of the distance between where each of them lived, Officer Pekarek also knew that Brown had been in town since the previous week, again making this less suspicious. *See Beck*, 140 F.3d at 1139 ("We are unwilling to suggest that a job search in a distant location is inherently suspicious merely because similar employment opportunities exist in closer proximity to one's residence," despite officer's "subjective disbelief of [defendant's] reason for his travels.").

"It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt." *Beck*, 140 F. 3d at 1136. An officer must, however, "be acting on facts directly relating to the suspect or the suspect's conduct and not just on a hunch or circumstances which describe a very broad category of predominantly innocent travelers." *Id.* (cleaned up). Thus, when factors can be consistent with innocent conduct, and the officer lacks a particularized, objective basis for relating those factors to criminal activity, reasonable suspicion has not been established. *See id.* at 1126-30 (reasonable suspicion not generated by combination of seven factors,

20

where each could be consistent with innocent conduct); *Jones*, 269 F. 3d at 922-23, 928-30 (reasonable suspicion not generated by defendant's nervousness and multiple incorrect and inconsistent answers regarding his criminal history where there were explanations for both factors "consistent with innocent behavior").

Here, the government relies on several factors to establish reasonable suspicion. The court has found that some of these factors, such as the visibly pulsing heartbeat and rapid breathing, did not occur as a factual matter, and that any suspicion arising from the other signs of nervousness were minimal, at best. There are explanations for the remaining factors that are consistent with innocent conduct, and the government has failed to articulate more than a hunch for how these facts warrant suspicion that Brown was committing a crime. Thus, Officer Pekarek did not have reasonable suspicion to prolong the traffic stop to deploy his canine. Because Officer Pekarek conceded that, but for the dog's indication he would not have searched Brown's vehicle, this search was in violation of the Fourth Amendment, and any evidence obtained from the search of Brown's car, including the gun, is suppressed. *See Mapp v. Ohio*, 367 U.S. 643, 654 (1961).

### C. Whether Brown's Statements are Fruit of the Poisonous Tree

The magistrate judge also concluded that, because there was no Fourth Amendment violation in the extension of the traffic stop, which allowed for the canine deployment and subsequent search of Brown's vehicle, there was also no "fruit of the poisonous tree" violation regarding statements made by Brown

after the canine deployment and vehicle search. Docket 45 at 31-32. Brown objects to this conclusion. Docket 49 at 9.

"[I]ndirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)). This evidence may still be admissible, however, if "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *Id.* (quoting *United States v. Crews*, 445 U.S. 463, 470 (1980)). Three factors are relevant in determining whether there is sufficient attenuation: "(1) the time elapsed between the illegality and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

Here, the first two factors easily weigh in favor of suppression. Almost no time elapsed between the canine deployment and Brown's statements. Immediately after the dog indicated to the odor of drugs, Officer Pekarek returned to his patrol vehicle and asked Brown additional questions based on the dog's indication. Exhibit 1B at 13:20. Similarly, Brown's statements about the gun were made approximately ten minutes after Officer Pekarek found the gun, and the only thing that occurred between finding the gun and those statements was Officer Pekarek's continued searching of Brown's vehicle. Exhibit 1B 27:35-38:18. Officer Pekarek also admitted that the conversation

about the gun only occurred because of the search of Brown's vehicle. Docket
44 at 37. The third factor also weighs in favor of suppression because Officer
Pekarek relied on facts that the court has found did not occur to justify his
extension of the traffic stop. Thus, all statements made by Brown after the
canine deployment are suppressed.

## CONCLUSION

The court adopts in part and rejects in part the magistrate judge's Report
and Recommendation denying Brown's motion to suppress. Thus, it is

ORDERED that

1. The portions of the Report and Recommendation (Docket 45) that were
not objected to by either party are adopted in full. With regard to the objections
filed by the defendant, the Report and Recommendation is adopted regarding
the magistrate judge's findings that Officer Pekarek observed Brown's rigid
body posture and staring straight head; that Officer Pekarek relied on Brown
coming from the Cockatoo and the distance between where Brown and his
brother each lived in developing suspicion; and that *Peralez* is inapposite to
this case.

2. The Report and Recommendation (Docket 45) is otherwise rejected.

3. Brown's motion to suppress (Docket 36) is granted in full.

Dated February 1, 2022.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

23